Our next case for argument today is 25-1213, Printing Textiles v. United States. Mr. Vils, please proceed. May it please the Court. Kerem Bilge for Plaintiff Appellant, Printing Textiles. Your Honors, I think the core question before this Court today is whether Commerce's scope ruling in the underlying proceeding has unlawfully changed or expanded the original scope of the order by replacing adherence with receptivity in the second sentence of the scope of the order, and thereby changing the scope of the order. And as you know, the order says that the covered merchandise is artist canvases that are primed or coated, whether or not it is containing an increceptive topcoat. And then the second sentence states that the priming and coating includes application of solutions that are designed to promote adherence of ink or paint to the underlying fabric. And this second sentence has been interpreted by Commerce in multiple instances to specify the type of coating or priming that is required for a product to be included within the scope of the order. And our brief extensively details the history of this order in multiple scope proceedings. The Commerce- Do I remember correctly? The question is whether this second sentence is definitional of what the priming coating is- That's correct. Versus whether it's saying, hey, priming coating includes this one type of thing, but that doesn't necessarily mean that it doesn't include other types of things. I mean, that is the key. That's the crux of the dispute, right? Your Honor, I think CIT found that the word including in the second sentence creates ambiguity as to whether the second sentence is definitional or just illustrative.  Commerce did not make that finding in the underlying proceeding. And the record shows that the intent was always to use the second sentence as the definitional character of the priming and coating that is required for a product to be included within the scope. And there is like a 2019 scope ruling from Commerce about a different product that is also made of polyester. And in that ruling, Commerce said that the second sentence, meaning the priming and coating that is, that promotes receptiveness, which is, I think, the second key argument that we're making, that promotes receptiveness is a required characteristic of the product to be included within the scope. And in fact, they found that that product was not included within the scope, even though it was coated with a material that does not promote adherence or receptiveness of the fabric to ink. So I think the key question here is whether Commerce's use of receptiveness instead of adherence is contrary to the plain meaning of the order and whether it unlawfully changes the meaning of the scope. As mentioned, Commerce found in the scope ruling that the CBM, our product, is included within the scope because CBM's primed and coated side is receptive to artist materials, receptive instead of adherence. And they also dismissed two expert reports that show that the coated side did not perform any better, and in fact, it performed worse in 75% of the cases against the uncoated side, meaning that the coating used does not promote adherence of the ink to the underlying fabric. But despite this, Commerce dismissed all this evidence because it reinterpreted the meaning of adherence as receptiveness. Is this getting into your argument about how Commerce erred by not considering certain K2 sources? No, Your Honor. This is more on K1? Yeah, I think it's K1, and it's rather the argument is that does receptiveness mean the same thing as adherence? And the answer is no. But you are also arguing that there is a failure to move on and consider K2 sources, right? Yes, that's also a separate argument. And to be clear, I was not the record counsel when the brief was drafted or filed, and I'm briefing— You're just stuck with it. I'm kind of stuck with it. But the primary argument is legal, meaning that whether Commerce's determination that receptiveness means adherence is contrary to the plain meaning of the order. And there is evidence on the record showing that adherence means the act of adhering, meaning that to hold fast or stick to a surface. And in the context of this order, it obviously means whether a fabric, a coated fabric, can actually adhere the ink that lands on the surface. Do you want to abandon your K2 argument now? I think the K2 argument— It wasn't yours, so. I think the K2 argument is that—and I'm not going to talk about it in detail, but it's basically that— Do you want to abandon it? If you say so, Your Honor. No, no, no. You get to choose. I want to talk about the main argument instead of the K2 argument. So the adherence—there's evidence on the record that adherence means entirely something else than receptiveness in the sense that adherence requires a coating to promote the ink to stick to the surface. And as I mentioned, there are two test reports on the record that say that this product is not coated with the material that promotes the adherence of the ink to the fabric. And in contrast, receptiveness essentially— Commerce never defined what receptiveness means, but the plain meaning of it is obviously different than adherence, meaning that there's a dictionary definition on the record that defines receptiveness as the act of receiving, and in the context of this order, whether ink can land on the surface of a fabric. But the act of—the adherence in the context of the order is a lot more limited. And for that reason, the commerce's replacement, substitution of the term adherence with receptiveness is contrary to law and I believe should be reversed by this Court. And I will note that the reinterpretation of the scope essentially infected Commerce's entire factual analysis as to whether our product is within the scope of the order, because, as I mentioned, there are two test reports on the record that show that the product is not coated with the material that promotes adherence of ink to the fabric. But all Commerce said was, we do not adopt the definition of adherence as the experts did. They looked at whether it improves the receptivity of the canvas. Exactly. But the argument is that receptivity is not the same thing as adherence. And one of the test reports, LAB 2010, test report actually did not adopt any official definition of adherence, but they just tested the product based on an international standard, ASTM standard, and found that the coating does not promote adherence of the material, of the ink, artistic material. And the other experts basically adopted the dictionary definition of adherence and used that as the basis to determine whether a product is in scope or not. And if this Court agrees with our definition, with the plain meaning of adherence as used in the scope, then Commerce's finding would also fail the substantial evidence standard, because it would mean that they essentially ignored or misinterpreted two key evidence that is on the record that significantly detract from their conclusion. We wouldn't decide that in the first instance, right? If we agree with you on the legal issue, at most you're going to get a vacate and remand, right? Exactly. Okay, do you want to save the remainder of your time for rebuttal? Yes, I will save my time for rebuttal. Thank you. May it please the Court. The scope language at issue in this case requires that the product, one, be an artist's canvas, that, two, has been primed and coded. This priming and coding includes the application of a solution designed to promote the adherence of artist materials. The record evidence in this case, including Appellant's own scope application, clearly establishes that Canvas Banner Matisse, or CBM, is a canvas that has been primed and coded. In fact, their own patent for CBM states that it has a, quote, ink-receptive coating, end quote, that is applied to a canvas. Can I back up for a minute? Sure. Just to ask you, are you agreeing that the scope of the word includes is not really an issue in this case? We do agree. Whether that sentence, the second sentence of the order, is exemplary or whether it's definitional. Yes. We do not think that that's something the Court needs to decide, in this case to affirm, because Commerce here determined that this was adherence. It didn't rely on anything other than these. So now the question, the challenge that we have before us is whether Commerce had too broad of an interpretation of adherence, right? I think that's fair assessment, Your Honor. And so why is the adherence meaning receptivity? Why is that correct? What sources support Commerce's determination? So Commerce did a thorough analysis here of the K-1 sources in looking back at how it has defined adherence. And it went through all of its prior scope rulings, but probably most importantly was the ITC final report, which said, quote, Artist's canvas is a surface for the graphic presentation of painted or printed images. It is made from woven fabrics that is primed or coated, gessoed to accept paints or inks. And that's Appendix 473. And Commerce went on in its analysis. So it's the to accept phrase that's the most what you're focusing on?  To accept and then through its prior scope of rulings, Commerce further refined that to mean receptivity. And Commerce went through and analyzed that and showed that the receptivity is how, from the ITC ruling all the way through the various scope rulings that are discussed on the record, receptivity is what it has understood adherence to mean throughout this order. And I think that that's particularly important here where Commerce rejected the third party testing that was put on the record by the appellant here. And of particular importance here, the third party testing noted that the testing results reflect a subjective qualitative judgment that's based on whether the adherence of the ink was the worst, the same or better. And so Commerce determined that that's not like the definition of adherence that's put forth by the appellant on the record was not a workable definition because it relied on just the subjective interpretation of these experts versus what Commerce relied on, which was the idea of receptivity. And that's very clearly established in the record here. Is there anything about the language promote the adherence of that changes it, changes that analysis? You know, I mean, I think that's part of the argument that I saw in the briefing was really emphasis on promote the adherence. Somehow that made it different than just hearing or being receptive. Right. I think that that's fair, Your Honor, like promotes the promotes the adherence. You know, when as here we have a product that is clearly designed to be printed on to receive printed images. That's the I think that's the same thing. And Commerce determined this as well as adherence. And so when we're in this world of artist canvases and if you also if you look at the rest of the scope language, it gives examples of what artist canvases are. And one of them is printable canvases. And so here where we have CBM, which their patent notes, that is a is designed to be printed on with ink printers. And their own statements describe the use of this. The expected use is for art reproduction. This is clearly a commerce concluded rightly that this is clearly a canvas that's designed to be printed on, which is a printable canvas. My friend on the other side noted the the prior evidence that the third party testing. And I just want to flag that commerce noted beyond just the subjectiveness of it, the several other problems. The individual examiner stated that, quote, No chemical analyses can characterize adherence and no standardized tests are available to measure adherence. That's at Appendix 473. And underlying sort of all of this is the appellant here is trying to draw a distinction between what it understands to be the bottom coat of priming and coding and a top coat of priming and coding. And they're arguing that the bottom coating is not doesn't promote the adherence of ink and the top coating is receptive to ink. But that doesn't matter. And my understanding of commerce concluded there that that the distinction they're trying to draw between the bottom and top of the bottom and top coating is irrelevant. And it appears from their testing that it was analyzing only this bottom coat of this bottom coating that they're saying. And the two two more things I wanted to emphasize here. I know this was like this was a reinterpretation of the order. And as I noted before, from the time of the ITC report, commerce was understanding promotes the adherence to mean to mean accepting artist materials, which it further refined to mean receptivity. The scope orders that commerce is found to be out of scope in both of those in both of those determinations. They the material the product at issue was printed side of the material was not used at all for printing or for putting material artist materials on it, which is not the case here on this record. And my final note, if there's no further questions, is that my friend the other side, we were there's discussion of the not using the K2 sources. K2 is clear that those only need to be used if the K1 sources are not determinative, which commerce did determine that the K1 sources were determinative here. I would be just curious, what would we say or you would apply if as to whether commerce's determination that it didn't have to go beyond K1, K1 resolve the issues or didn't have to go to K2. Is that something reviewed for substantial evidence? Can you say that one more time, Your Honor? What what is the standard that applies the legal standard that applies to our review to the question of whether commerce erred and not moving on to K2? I think I think it's got to be something. But I think it would be reviewing it for substantial evidence. If if if this court concluded that commerce's K1 determination wasn't supported by substantial evidence, then I don't necessarily think that would be an error to move on to K2. But it would just be not supported by substantial evidence. OK, thank you. We respect requests that you refer to the Court of International Trade. Mr. Thompson. Good morning, Your Honors. George Thompson on behalf of Defendant Appellee Eckertech-Styles. I'd like to follow up on the excellent presentation by government counsel. There were a couple of points which the panel raised that I'd like to go into more detail upon. First, regarding K2, I would point out that the initial scope request specifically disavowed the application of K2 and said this can be a K1 determination. So any allegation that commerce somehow erred by not conducting a K2 analysis. I don't think that's fair. So, for example, you all often argue that something is absolutely clear and can be decided as a matter of law. But you both think it's absolutely clear the opposite way. And that's kind of what is at issue here with them saying it can be decided under K1 in their favor. If it can't be decided under K1 in their favor, they absolutely think you should go to K2. Or at least I think they have made that argument, whether he's sticking to it or not. Okay. Well, then I would point out that, as government counsel noted, it's sufficient to make a determination on K1, so there's no need to get to K2. And I don't understand that appellant is arguing to the contrary. Of course, they say K1 is sufficient. So that's kind of the battleground here, along with the plain terms of the anti-dumping duty order. Now, I'd like to go into more detail on the testing. We have expert reports that say the product is inferior for ink adherence. Now, that's a little bit disingenuous, I believe, because the testing was done on the product based on the substrate, not on the product as imported. And indeed, one of the experts, Dr. Work, acknowledged that the priming coating layer contributes, quote, slightly to absorption of ink. So even under the constrained interpretation that is presented by appellants, that substrate does have ink adherent properties. But that's not the proper test. You don't just look at whatever the substrate was, and we have no idea what the chemical composition was. We don't even know if there was a chemical primer at all. The imported product has a top coat. And the expert report pointed out that the top coat does allow the purpose of the top coat added to the primed, quote, or prime bottom, quote, coated side is to hold the pigments up on the surface, thereby optimizing print quality color and to enhance water resistance. That's adherence right there. However you define that term, it holds the ink on top of the product. So it's the testing did not address the actual imported product. And that's based on the misinterpretation of the order that somehow the lower level, the primary level, has to be ink adherent as well. Here it does satisfy that requirement. We're out of time. Okay. So thank you for your argument. Thank you, Your Honor. Mr. Bills, you have some rebuttal time. Your Honors, I want to start with the last point that my colleague made in connection with the testing report and how the product was tested. If you look at Appendix 153 through 162, this is the attachment A to Dr. Work expert report that details how the test was conducted. And you will see that in column three of each page, they describe the product and they say that test with coating with top coat front and back, which means that the product was tested with the top coat on. So the record does not conclusively show that Dr. Work tested the product with only the fabric or just the bottom coat. It does show that the product also had the top coat, which means that even with the top coat, the product just failed the adhesion test. The second point about Commerce's reliance on ITC reports as the primary source for reinterpreting adherence as receptiveness, is that the problem is that the ITC report does not actually use the term receptiveness or receive at all. It just says that the product, the artist's canvas is primed and coated to accept ink to the fabric. Acceptance is also not defined and there is no evidence that the ITC intended to redefine adherence in that general description of the product, but rather it was referring, in my opinion, to the product as one of the qualities of the product as to be able to accept ink. But the plain meaning of adherence is different than receptiveness and acceptance, as the record shows. And that's why I believe Commerce's reliance on this specific K1 source is not sufficient to support its determination that adherence means something other than adherence. And the other source that they relied on in their scope ruling was their prior scope rulings determining that receptiveness is the appropriate standard for this product. But if their erroneous determination in 2019 as to the meaning of adherence and reliance on that in the scope ruling only compounds the error that they made at the time and should not be a basis for supporting their argument that the correct interpretation of the term adherence is receptiveness. And as to the K2 issue, yes, the plaintiff appellant argued in the scope ruling that the K1 sources should be dispositive to show that the CBM is not included within the scope of the order. But as you said, Your Honor, it does not mean that they abandoned the K2 argument. And the scope ruling request actually shows that they provided a lot of information showing that if Commerce were to make a K2 analysis, they would have found that the CBM product is different from the products that are typically covered by the scope of the order. And that's why the claim that Berger did not argue that K2 is applicable is not accurate. Okay. Well, I think we're out of time. So I thank all counsel for their argument. This case is now taken under submission. Thank you.